GRIGGS *v.* SAGINAW & FLINT RAILWAY CO.

1. APPEAL AND ERROR—EXCLUSION OF TESTIMONY—ERROR CURED BY VERDICT.

An assignment of error, in an action against a street railroad company to recover damages for personal injuries sustained as the result of the derailment of one of defendant's cars at a certain switch, on exclusion of evidence that defendant's cars had been derailed at this switch in a similar manner on former occasions, offered to show defendant's knowledge and negligence, is disposed of by a verdict in plaintiff's favor.

2. EVIDENCE—WITNESSES—FAILURE TO CALL—PRESUMPTIONS — IN-
STRUCTIONS.

In an action against a street railroad company to recover
damages for personal injuries, where plaintiff was attended
after the accident by two physicians, one of whom was his
family physician, who was not called by plaintiff as a
witness, nor his deposition taken, he being absent from
the city at the time of trial, an instruction that the jury
might consider whether or not plaintiff knew such phy-
sician was going to be absent and that a presumption
would arise from the unexplained absence of the physi-
cian's testimony that if produced it would be adverse and
the jury might so consider it, was proper.

3. SAME—WITNESSES—IMPEACHMENT—CROSS-EXAMINATION.

In a personal injury action, where impairment of plaintiff's
memory was claimed as one of the results of the injuries,
testimony on cross-examination of plaintiff that he had
been under observation in a psychopathic hospital on com-
mitment by a probate court some time before the accident,
was admissible as bearing on the question of plaintiff's
condition of health prior to the accident as testified to
by him.

4. DAMAGES—PERSONAL INJURIES—QUESTION FOR JURY.

Compensatory damages to be awarded in personal injury
actions are contingent on the extent, nature and perma-
nency of the injuries suffered, and are peculiarly appro-
priate for the estimation and determination of the jury,
as they find the facts to be.

5. SAME—INADEQUACY OF VERDICT—EVIDENCE.

A verdict for $50, as damages for personal injuries, *held*,
not inadequate, where the testimony as to the extent, na-
ture and permanency of the injuries suffered was con-
flicting and that of plaintiff was discredited by apparently
disinterested witnesses.[1]

6. SAME—EVIDENCE—VERDICT—IMPROPER MOTIVES.

In a personal injury action *held*, that the record in its
entirety showed that the jury were not influenced or
actuated by malign or improper motives in arriving at
their verdict as to amount of plaintiff's damages.

[1]On excessiveness or inadequacy of verdict in actions for per-
sonal injuries other than death, see comprehensive note in L.
R. A. 1916F, 30, 492.

Error to Genesee; Wisner, J.   Submitted January 17, 1917.   (Docket No. 17.)   Decided May 31, 1917.

Case by George R. Griggs against the Saginaw & Flint Railway Company for personal injuries.  Judgment for plaintiff for an insufficient amount, and he brings error.  Affirmed.

*Benjamin & Betzoldt*, for appellant.

*Weadock & Weadock* (*Lewis J. Weadock*, of counsel), for appellee.

STEERE, J.   Plaintiff recovered a verdict and judgment against defendant of $50 in the circuit court of Genesee county for personal injuries inflicted upon him by one of its cars at an interurban station in the city of Flint.  He has removed the cause to this court by writ of error, claiming that the verdict as to damages was contrary to the weight of evidence and the award clearly inadequate, attributable largely to errors committed by the court in rulings during the progress of the trial and the charge to the jury.

The accident upon which this action is based occurred on June 5, 1912, at the Detroit United Railway station located on the east side of North Saginaw street, in the city of Flint; the station and track at that point being used jointly by that company and defendant.  The main line is along Saginaw street, running north and south.  At the station a switch track turns from the main line to the east and runs along the south side of the station to the car barns at the rear, there being a switch in the track to the barns near the east sidewalk of Saginaw street, immediately south of the station waiting room, with curves leading from the switch point northerly and southerly into the main track.

On the morning of the accident plaintiff, a farmer 70 years of age, went with his grown son to the interurban station intending to take one of defendant's cars for Saginaw. A Saginaw car came out from the barns and stopped on the south side of the waiting room, preparatory to turning from the switch point south on to Saginaw for a run to Court street, whence it would return north along Saginaw street to the station, and go on from there to Saginaw city. Plaintiff was advised of this, and stood waiting on the walk just north of the switch track and west of the waiting room as the car started again on its preliminary run to Court street, when the rear wheels climbed the point of the switch as it was taking the curve south on Saginaw and left the rails, the car striking plaintiff as it swung, throwing him down and inflicting injuries, the severity of which is a matter of marked dispute.

It was claimed by defendant that plaintiff stood carelessly close to the moving car running slowly around the curve, which necessarily swung its rear over the walk, and that it was stopped within a few feet just as the wheels were leaving the rail; while plaintiff claimed that had the wheels not left the track he was a safe distance away on the walk, or platform of the station, and in the exercise of due care; that the sole cause of the accident was running the car around the curve at an excessive rate of speed, purely attributable to defendant's negligence. As the jury found in plaintiff's favor on that issue, it becomes unnecessary to discuss the testimony with reference to it.

A motion for a new trial on numerous grounds was denied by the trial court, and plaintiff brings the case here for review upon 27 assignments of error, which may be condensed into the contentions that the damages were inadequate, the court erred in admitting

testimony showing that in June, 1911, the year prior to the accident, plaintiff was confined in the psychopathic ward of a hospital at Ann Arbor, that the court excluded evidence of other accidents similar to this, on the same curve, and certain portions of the charge to the jury were prejudicially erroneous.

Plaintiff's assignment of error on exclusion of testimony that defendant's cars had been derailed at this switch in a similar manner on former occasions, offered "for the purpose of showing both knowledge and negligence on the part of defendant," was disposed of so far as this case is concerned by a verdict in his favor finding negligence on the part of defendant.

That plaintiff was thrown down by the car which struck him and sustained some external injuries is not disputed. He was carried into the waiting room and laid on one of the seats in a dazed or unconscious condition, as he and his son testified. The station agent telephoned for Dr. Stuart, defendant's physician in that city, and the son procured some whisky for his father, who took a small amount, and said "no" when offered more. The physician arrived in a few moments, saw on superficial examination that plaintiff had a wound on his head and required attention, spoke to him, and, concluding he could be moved, took him, at the instance of the son, who was with him in his automobile, to the home of another son who lived in the city, where he gave him medical attention and dressed his injuries. That evening Dr. Stuart took plaintiff to his home in the country in his automobile, visiting him the following morning and attended him professionally for about a week, making five calls, until he saw no occasion for further medical attention.

Plaintiff claimed and testified to having sustained serious and permanent injuries to his head, right shoulder, arm, hip, and a bruise on the calf of his leg,

which caused constant pain and left him in shattered health; that before the accident he was in good physical condition for his age, with sound memory and keen sight, able to work on and look after his farm, but, following the accident, and as a result of it, his arm was crippled so that he was obliged to carry it in a sling for some time, which he estimates "might have been for three weeks"; that his right leg was crippled from the injury to his hip; that he suffered pain in the back of his head, in his hip, and from disorder of the bowels, so that he was no longer able to work on his farm and attend to his affairs as before. On the other hand, it was defendant's contention to the jury that the injuries plaintiff received on the occasion in question were not permanent, but only superficial, bruises and cuts, from which he soon recovered, and he feigned their continuance, magnifying them to increase the damages he sought to recover.

In support of his testimony that his right leg was permanently injured plaintiff called a Dr. Millard, his only expert witness, who testified that in an examination of plaintiff made on December 30, 1913, he found a discolored spot over the right hip to the rear of the hip joint and the right leg one-half inch shorter and over two inches less in circumference at a given point above the knee than the left. This, he stated, might result from many causes, and answered various hypothetical questions on the subject. He had never treated plaintiff, but when making the examination received a partial history of the case from his statement that he was in a railroad accident. Defendant contended that what the physician found had no connection with the accident, but was the result of an old injury. In answer to leading questions on cross-examination plaintiff said that when about 17 years of age he had an accident in which—

"I got my right leg broken twice in two, got a bad

set in it, shortened the limb just a little and made a little hitch, but I never was lame in it. * * * I knew the surgeon said it had went so long— It was broke at a slant, and had contracted and drawn up; they could not pull it back."

It was disclosed that following this accident two physicians attended plaintiff, Dr. Stuart, called by defendant's station agent, and Dr. Jickling, plaintiff's physician, who was also called in the afternoon of the accident by plaintiff, who testified that he sent for him and he came to see him at his home every day the other doctor did; "Dr. Stuart came in the forenoon and Dr. Jickling in the afternoon;" that he understood Dr. Jickling was in Panama. On cross-examination he testified that he had consulted with the doctor about his injuries, knew of some one seeing him with reference to his suit, did not remember sending any one himself, or think he suggested it, but that his "lawyers suggested it themselves"; that he heard the doctor was going and thought the interview was before he heard it. Dr. Jickling was not a witness nor were his depositions offered. Dr. Stuart was called by defendant.

Referring to the undisputed testimony that the two physicians were in attendance on plaintiff shortly after the accident, and that but one had testified, the court on defendant's request charged the jury that they might consider the testimony relative to Dr. Jickling's going away, and whether or not plaintiff knew he was going to be absent, saying further in part:

"Whenever the evidence introduced in the trial of an issue of fact shows that the testimony of some witness whose testimony would greatly aid the court or jury before whom the issue is being tried in determining the truth or falsity of such issue, and that the testimony of such witness could not be used without the consent of such one of the parties to such action,

and such witness is not produced or the testimony of such witness is not taken by such party, the jury may consider such fact that the testimony of such witness, if given would be contrary to the claim of the party who has failed to produce such witness in open court, or to have such testimony taken by deposition."

It is urged that this instruction was erroneous and prejudicial, because no evidence in the case indicates that plaintiff was responsible for the doctor going or knew when he left, and that before any presumption can arise against a party for failure to call a material witness it must be shown to have been within the power of the party to produce such witness, citing 16 Cyc. p. 1062, and numerous other authorities.

At the time of the accident Dr. Jickling was plaintiff's family physician, located and practicing in the city of Flint. He was plaintiff's attending physician after the accident. He was seen by some one in reference to this suit, at the suggestion of plaintiff's attorneys. Presumptively his presence or his deposition was available to plaintiff. His testimony was not available to defendant without plaintiff's consent. Having attended plaintiff as a physician, he possessed peculiar knowledge concerning facts essential to the issue bearing on the truth or falsity of plaintiff's claim. There is no evidence that his deposition could not have been taken, and no proof of his absence from the jurisdiction of the court, beyond plaintiff's hearsay testimony that he heard he was going and understood he was in Panama. Though not a model in expression, especially as punctuated in the record, the charge complained of fairly instructed the jury that the unexplained failure to produce the testimony of this witness raised a presumption that if produced it would be adverse to plaintiff, and the jury could so consider it. His counsel apparently so construes it in their brief, contending that such presumption

does not arise, because the doctor was absent from the jurisdiction of the court, and plaintiff is not shown to have been responsible for his absence. The jury was not told that plaintiff was responsible for failure to take his deposition or to produce him at the trial, but was told they might consider "whether or not the plaintiff knew that he was going to be absent," and, in substance, that under the facts in this case a presumption would arise from the unexplained absence of his testimony that, if produced, it would be adverse and the jury might so consider it. As applied to the situation disclosed here, we think the principles embodied in this instruction find support in *Vergin* v. *City of Saginaw*, 125 Mich. 499 (84 N. W. 1075); *O'Connor* v. *City of Detroit*, 160 Mich. 193 (125 N. W. 277); *Dowagiac Manfg. Co.* v. *Schneider*, 181 Mich. 539 (148 N. W. 173); *Cooley* v. *Foltz*, 85 Mich. 47 (48 N. W. 176).

Serious complaint is made of the court permitting defendant to show that in June, 1911, plaintiff was an inmate of the psychopathic ward of the hospital at Ann Arbor, which is urged as error particularly prejudicial to plaintiff's claim for damages, because unfairly tending to minimize his testimony before the jury by the implication that he was mentally incompetent to testify rationally as to his injuries.

The evidence upon this subject was developed in connection with plaintiff's cross-examination. Both he and his son had testified that prior to the accident his general health was good. He also testified that his memory was impaired as one of its results, while it was pretty good before. In that connection he was asked in cross-examination if he had been in the psychopathic ward at Ann Arbor in 1911. He replied that he was at Ann Arbor for treatment in 1911; he did not know what for; that he was in the hospital eight or nine days and then his sons brought him

home. He denied being taken there by the sheriff on commitment by the probate court of Genesee county, or that he was in the probate court in connection with any such proceedings. Following his denials and while upon that subject counsel for defendant introduced in evidence the files of the probate court relating to his commitment, as bearing generally "on the condition of health prior to the accident and impeachment of plaintiff's own testimony of that condition." All testimony upon that subject was allowed over the objection that the same was "incompetent and immaterial."

This testimony was not introduced for the purpose of showing plaintiff of unsound mind and incompetent as a witness at the time of the trial, because previously so adjudicated. Neither would the fact that he was an inmate of the psychopathic ward of the Ann Arbor hospital for a short time, for observation under the law, be evidence that he was then of unsound mind. Such was not defendant's claim or the avowed purpose of the proof. His sanity at the time of the trial and competency to testify were not questioned. In view of his and his son's testimony as to his previous good health, memory, ability to work and manage his farm, it was not incompetent to interrogate him on cross-examination as to any matters which might tend to throw light upon his former physical or mental condition as affecting his general health, efficiency, ability to work, and accuracy of memory formerly or at the time he was testifying. A reasonable latitude, in the discretion of the court, is always permissible along those lines in cross-examination of plaintiffs for damages *ex delicto*, particularly where the witness is evasive or irresponsive, and we do not find the discretion of the court was abused in the particular complained of.

The compensatory damages to be awarded in cases

of this nature are contingent on the extent, nature, and permanency of the injuries suffered, peculiarly appropriate for the estimation and determination of the jury according as they find the facts to be. No question is raised as to the charge of the court upon the measure of damages. Dr. Stuart was the only medical witness with personal knowledge of the injuries. He cared for plaintiff immediately after the accident, and attended him until his condition was such that he saw no further occasion to do so. He testified that he was neither hired nor discharged by plaintiff, but attended him professionally, and quit because he thought he had rendered such services as were necessary; not being aware Dr. Jickling was visiting him also. He stated that upon examination of plaintiff shortly after the accident, at his son's home, he found a scalp wound, which was a cut or incision with some contusion around it, a redness near the point of the right shoulder of which plaintiff complained on lifting his arm, and a little evidence of an injury or bruise on his leg near the knee; that he dressed his wounds, took him home, and on visiting him in the morning found him sitting in a chair in as good condition as could be expected; that he fixed a sling around his neck in which to carry the arm of which he complained, prescribed massage, a stimulating liniment and rest, and had no idea plaintiff sustained any permanent injuries. Plaintiff's neighbors testified to his being out and around his place soon after the accident, apparently as well and as able to work as before. A neighbor who lived about 20 rods west of him and had called to see him on the day following the accident testified that four days later he went over there and saw him driving some chickens around with a small fishpole, using it with both arms; that he did not have his arm in a sling, and witness never saw him with his arm in a sling after the first day he

visited him, following the accident. Plaintiff's testimony was in the extreme to the contrary. So many things, often of minor importance, which he denied, were proven by other and apparently disinterested witnesses that misgivings naturally arise as to the accuracy of his testimony upon the extent and permanency of the pain and suffering which he asserts. For those there is no definite, legal standard of damages. The foundation facts of the injury are for the jury, and with them decided it is their further province to make such award as in the light of all the evidence seems in their united judgment adequate. The trial court was not able to find on a motion for a new trial that the verdict was perverse, or inadequate. In 6 Thompson on Negligence (2d Ed.), § 7362, it is said:

"In cases where the amount of the award is attacked on the ground of *inadequacy,* the court will grant a new trial only where it *clearly appears* that the *jury must have been influenced by passion, prejudice, partiality, corruption or mistake as to the law or facts.*"

This record, considered in its entirety, fails to show that the jury was influenced by any of the elements above stated, or actuated by any malign or improper motives in arriving at their verdict.

The judgment is affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.