A'ENO *v.* LOWRY.

DAMAGES—NECK INJURY—ADEQUACY OF VERDICT—GREAT WEIGHT OF EVIDENCE.

> Verdict of $500 for plaintiff in action for neck injury received in an automobile accident *held*, not against the great weight of evidence nor inadequate, where there was evidence that she was released from the hospital on the same day as the accident, returned to work 10 days later, and continued to receive some treatment for the next 3 or 4 months, and evidence presented an issue of fact as to whether difficulty she had with her hand and arm a year later was attributable to defendant's negligence or some other causes.

BLACK, KAVANAGH, and OTIS M. SMITH, JJ., dissenting.

Appeal from Oakland; Dondero (Stanton G.), J. Submitted April 10, 1962. (Docket No. 48, Calendar No. 49,156.) Decided September 10, 1962. Rehearing denied November 5, 1962.

Case by Nickie M. A'Eno against Francis E. Lowry and John Francis Lowry for personal injuries sustained in automobile collision. Verdict and judgment for plaintiff. Motion for new trial denied. Plaintiff appeals claiming verdict grossly inadequate. Affirmed.

*Floyd T. Schermerhorn,* for plaintiff.

*Sullivan, Elmer, Eames & Moody (Blair Moody, Jr.,* of counsel), for defendants.

REFERENCES FOR POINTS IN HEADNOTE

15 Am Jur, Damages § 233.
Adequacy of damages in action by person injured for personal injuries to neck not resulting in death. 16 ALR2d 446.

Adams, J. This action arises out of an accident that occurred on March 6, 1959. Plaintiff was driving north on US–10. The highway was icy. Defendant John Francis Lowry was proceeding south. Lowry's car went out of control, careened across the highway, and struck plaintiff's automobile. Plaintiff sued, claiming some permanent disability in her hand and arm, pain and suffering, and necessary treatment by 4 doctors at an expense of $579.25. The jury brought in a verdict for $500.

Plaintiff contends that a new trial should be granted because the verdict is grossly inadequate. If a new trial is granted, plaintiff claims it should be restricted to the question of her damages.

Following the accident, plaintiff was taken to a hospital. She was released the same day and returned to work 10 days later. Dr. Cullen treated the plaintiff for 2 or 3 days. An X ray of her neck disclosed no fracture. He described her injury as a "sacroiliac strain" and on March 30, 1959, he wrote evaluating her condition as "disability lasting 2 weeks." Plaintiff continued to receive some treatment for the next 3 or 4 months. She complained of headaches.

Plaintiff had been selling real estate. In June, she shifted to the sale of automobiles because this job would not require as much driving or standing. In the fall of the year she went to New Orleans where she was employed as the manager of a bar. In November and December she paid 3 visits to a doctor. Two X rays were taken.

In the spring of 1960 it appears that she had some difficulty with her hand and arm. She thought that it was from holding a telephone in her hand too much. She received further medical treatment.

Doctors Joseph C. Cullen, Lewis Cohen, and Edward M. Gates testified with regard to plaintiff's injuries. Dr. Cullen could not recall that plaintiff

had ever mentioned to him any difficulty with her fingers or her elbow. Plaintiff exhibited her hands to the jury. Dr. Cohen, while attributing her disability to injuries to the neck, testified that the X rays of the neck showed no fractures and no definite abnormalities. He stated that if scar tissue were to develop, which in turn would affect the arm and hand, this would normally occur within a period of 3 months of the injury. Dr. Gates was unable to associate the injury to the arm and hand with the injury to the neck. He found no limitation of motion or other objective finding of injury.

The verdict is less than the total claimed for medical bills but on the basis of the testimony, the jury might properly have concluded that all of the medical bills were not for treatment of injuries received by plaintiff in the automobile accident. Other claimed financial losses were not clearly made out. Plaintiff does not appear to have suffered any loss of earnings, except for a 10-day period immediately following the accident. She undoubtedly experienced some pain and suffering.

The situation in the present case differs from the situation in *Fordon* v. *Bender,* 363 Mich 124, wherein the negligence of the defendant having been determined and the injuries having clearly flowed therefrom, this Court held that the plaintiff was entitled to recover his damages, including pain and suffering; or again from the situation in *Mosley* v. *Dati,* 363 Mich 690, wherein the jury failed to make an award for pain and suffering that was clearly a result of defendant's negligence. In the present case, there was issue of fact as to whether or not plaintiff's difficulty with her hand and arm was attributable to the negligence of the defendant or, occurring as it did almost a year after the accident, was from other causes and consequently not a part of her damages.

It cannot be said that the verdict of the jury is against the great weight of the evidence in this case. Under familiar rules, the matter was peculiarly one for decision by a jury. *Teller* v. *George,* 361 Mich 118; *Brown* v. *Arnold,* 303 Mich 616; *Griggs* v. *Saginaw & F. R. Co.,* 196 Mich 258. The verdict of the jury and the decision of the trial judge, refusing a new trial, are affirmed. Costs to appellees.

CARR, C. J., and DETHMERS, KELLY, and SOURIS, JJ., concurred with ADAMS, J.

KAVANAGH, J. (*dissenting*). To properly understand and dispose of the presented question there should be added, to the facts submitted by Justice ADAMS, the following:

Plaintiff, in support of her claim for a judgment, introduced proofs showing a loss of earnings amounting to $1,500; doctors' and hospital bills amounting to $579.25; $77 repairs to car; and $450 depreciation loss on car, making a total of $2,606.25. These together with compensation for pain, suffering, and permanent partial disability constituted her alleged cause of action.

Defendants denied negligence and alleged contributory negligence.

The jury brought in a verdict for plaintiff in the sum of $500.

Plaintiff is here on appeal from the denial of her motion for a new trial alleging:

1. The verdict was contrary to law and grossly inadequate.

2. The verdict was contrary to the great weight of the evidence.

3. The verdict was contrary to the specific instruction of the court relative to damages.

Justice ADAMS in his opinion tries to distinguish the facts in this case from those in *Fordon* v. *Bender,*

363 Mich 124, and *Mosley* v. *Dati,* 363 Mich 690, on
the theory that the injuries in those cases clearly
flowed from the negligence of the defendant.   He
then proceeds to hold that in the case before us
there was an issue of fact as to whether or not plain-
tiff's difficulty with her hand and arm was attribu-
table to the negligence of defendants or, occurring
as it did almost a year after the accident, was from
other causes and consequently not a part of her
damages.

The record does not sustain any of these conten-
tions.  Dr. Lewis Cohen of Pontiac, Michigan, testi-
fied on behalf of plaintiff, as a specialist on rehabili-
tation involving electromyography used in diagnosis
of diseases resulting from injuries to the cervical
region of the spine.  He treated plaintiff beginning
on October 4, 1960, for pain in the neck, lower spine,
numbness of left hand and left fourth and fifth
fingers.   The electromyographic examination dis-
closed a lesion of the left seventh cervical nerve
root, abnormality of sensation and atrophy of the
left hand—a condition likely to be permanent and
which might grow progressively worse.

On direct examination, Dr. Cohen described his
findings as follows:

"*Q.* Well, now, would you tell the jury what was
the result of your physical finding?

"*A.* The most important results, as far as the
abnormalities in the physical examination, the re-
flexes and the feeling and coordination and the
muscle strength of the extremities were normal ex-
cept for moderate muscle atrophy at the ulnar aspect
of the left hand.  That means that the side of the
left hand, adjacent to the little finger, was not as
full on the left side as it was on the right side.  And
over this same area of the left hand, the medial
aspect of the left hand and also of the left 4th and
5th fingers, the medial aspect, there was some failure

of the sensation. In other words, she couldn't feel a pin prick on the medial aspects of the 4th and 5th fingers and on the medial aspect of the left hand.

"The hand grip was measured on both sides, and measured 60 pounds on each side.

"Another finding on the examination—these are all abnormalities which I am taking out of the examination report—the posterior cervical spine was tender to palpation and percussion. There is no muscle spasm, but there is moderate limitation of motion on attempting rotation of the head to the left. And, as I have noted, she could turn about 50 to 75% to the left, but beyond that it was painful. * * *

"The electromyographic examination was abnormal in that it revealed a lesion of the left seventh cervical nerve root.

"*Q.* Is that in the neck, Doctor?

"*A.* Yes. The spine—."

Dr. Joseph C. Cullen, testifying as plaintiff's witness, said he had treated plaintiff beginning about 2 or 3 days after the accident for injuries in the cervical, dorsal, and lumbar areas of the spine until she left for the South in October 1959, and continued treating her upon her return to Detroit. He testified of her complaints of disability in the neck and back throughout her treatment and he had found it necessary to send her to Dr. Curtis for further examination.

The only witness sworn by defendants was one Dr. Edward M. Gates. He testified he first saw the plaintiff and examined her on October 14, 1960, one year and 7 months after the accident, and he found the abnormal atrophy condition of the left hand, forehand and fingers, as described by Dr. Cohen. Dr. Gates was asked if in his opinion the atrophy of the left hand had a causal connection with the plaintiff's injury and accident. He did not answer the question, but indicated he felt it was a typical

ulnar type loss, rather than a cord injury or root loss. He testified that this type of ulnar lesion is more what is seen from injury to the elbow, normally associated with secretaries and Bell Telephone operators. He further indicated this ulnar lesion was not associated with any other root lesion, and then went on to explain:

"Now to specifically associate, we will say, to a cervical spine injury—and we have seen nerve root injuries from cervical injuries—we usually have fracture present. And, as far as I know, there is no fracture present here or a cervical dislocation."

Dr. Gates indicated he usually found this type of thing in a typical whiplash type injury. Under cross-examination, Dr. Gates testified:

"*Q.* And you saw Mrs. A'Eno on 1 occasion?
"*A.* Yes.
"*Q.* Just 1 time only?
"*A.* Yes.
"*Q.* And you made an examination of her on behalf of the defendant in this cause?
"*A.* Yes."

Dr. Gates testified further as follows:

"*Q.* Now, Dr. Cohen has testified that his examination upon Mrs. A'Eno by this electromyogram disclosed a lesion of the left seventh cervical nerve root.

"Now there was nothing in your examination that you would feel that you could reasonably dispute Dr. Cohen in this respect, is there?
"*A.* He found no other nerve root lesion?
"*Q.* His interpretation was a lesion of the left seventh cervical nerve root, by this electromyogram.
"*A.* Could I see his report?
"*Q.* Is that the one dated 10–4–60?
"*A.* Yes.
"*Q.* Do you want to read that to the jury, Doctor?
"*A.* 'Using intramuscular electrodes, the major muscles of both upper extremities, shoulder girdles,

and posterior cervical muscles were surveyed (4th cervical to 1st thoracic spinal nerve innervation), bilaterally. "Findings: 1. Denervation fibrillation potentials are localized in the left teres major, left triceps brachii, left abductor digiti quinti, 1st dorsal interosseus and adductor pollicis muscles. 2. Polyphasic potentials are seen frequently in the above-noted muscles during voluntary contraction. Interpretation: Lesion of the left seventh cervical nerve root." '

"*Q.* The interpretation was that it was a lesion of the left seventh cervical nerve root; is that right?

"*A.* Yes.

"*Q.* Now you are in no position to dispute Dr. Cohen in that finding?

"*A.* In what respect?

"*Q.* Well, to say that it wasn't true or it wasn't so.

"*A.* Only on the basis that electromyography is not gospel.

"*Q.* But you have used it as gospel in many of your other cases?

"*A.* No; we have used it as correlative findings of the patient's clinical symptoms.

"*Q.* As a matter of fact, this symptom of that anesthesia in these fingers on the left hand, and the moderate degree of atrophy on the edge of the hand, that is a symptom which leads directly to the seventh cervical nerve?

"*A.* But it also could be of the ulnar nerve itself, which is part of the seventh cervical nerve root.

"*Q.* But the ulnar nerve is further along in the chain of nerves for the chain of sensations, which is located at the elbow?

"*A.* Yes; but the muscles are not supplied by a single nerve root.

"*Q.* But now had you sent this patient to Dr. Cohen, as you have sent other patients to Dr. Cohen, to secure this electromyogram examination, you would have accepted, without question or argument, his interpretation of the finding of this electromyogram?

"*A.* I would have correlated it with my clinical findings.

"*Q.* You would have correlated it. Now you got no history of her banging open doors with her elbow, did you?

"*A.* No, sir.

"*Q.* There was nothing in her history or your examination of the elbow to indicate that the elbow had any reasonable source of the affectation of this hand that was there?

"*A.* No, sir; I don't think I implied that.

"*Q.* Well, as long as we understand it. Then we can exclude the elbow as being any source at all?

"*A.* Not necessarily.

"*Q.* From your examination.

"*A.* Not necessarily.

"*Q.* Then will you explain to the jury why we cannot exclude the elbow, if you haven't found anything in your examination or anything about the elbow to indicate a source of this condition? Will you explain?

"*A.* You may not find any abnormality in the elbow *per se.* That does not mean that in the past the patient has not traumatized or injured the nerve at the level of the elbow.

"*Q.* Then you have no history of that trauma, have you?

"*A.* No.

"*Q.* And that suspicion of the possibility of a trauma is purely speculation?

"*A.* It is purely speculation.

"*Q.* And she did have an injury to her neck—

"*A.* Yes.     *     *     *

"*Q.* You didn't see her until nearly 2 years after this accident. So, you had no chance to examine what part of her body was injured.

"*A.* That is a distinct disadvantage.

"*Q.* And there could have been considerable improvement in some of these injuries up until the time you saw her?

"*A.* That is right.

"*Q.* Then you would only know about these injuries by her history?

"*A.* That is right.

"*Q.* And you didn't get any more history than what you read to the jury here today?

"*A.* That is right."

On redirect examination of Dr. Gates the following questions and answers were given:

"*Q.* Your opinion, Doctor, based on your findings, what specific nerve involvement here do we have?

"*A.* Well, this is ulnar distribution.

"*Q.* Pardon, sir?

"*A.* This is ulnar distribution.

"*Q.* And, from that point, you would then arrive at the conclusion that it is, should I use the words, 'just as likely' that such an injury could occur at the elbow than hypothetically in the neck?

"*A.* Yes."

Dr. Gates was asked the following questions and gave the following answers on recross examination:

"*Q.* Doctor, you don't know whether she hurt her elbow in this crash or not, do you?

"*A.* No.

"*Q.* And if it was the ulnar nerve, it is supplied by the seventh cervical, isn't it?

"*A.* It is one of the roots.

"*Q.* Well, the real damage that you see and find located in the ulnar nerve could have its stem, or its source, in the seventh cervical?

"*A.* It could have part of it."

An examination of the entire testimony of Dr. Gates does not negate in any way the testimony of plaintiff's doctors. Certainly it cannot be said that this speculative testimony should be given the weight attributed to it by Justice ADAMS.

Clearly, this case is one in which the language used by Justice BIRD in *Walker* v. *Britton,* 193 Mich 174, is directly applicable (p 176):

"The trial court explained to the jury in detail what their duties were in the premises, and opened the way for them to find that defendant was without fault, but they persisted in finding him guilty, and they should have followed that finding by an allowance of some reasonable compensation for what she had lost and suffered by reason of that negligence. The sum allowed is so grossly inadequate, and bears so little relation to what was shown to have been plaintiff's actual damages, that the verdict should have been set aside on the ground that it was clearly against the weight of the evidence."

In *Mosley* v. *Dati,* 363 Mich 690, Justice SOURIS in referring to *Fordon* v. *Bender,* 363 Mich 124, indicated that we there reversed a judgment for inadequacy of a jury verdict in a personal injury case because the great weight of the evidence compelled an award of damages for pain and suffering and because failure to award such damages by returning a verdict equal only to plaintiff's special damages manifested disregard by the jury of proper instructions given by the court. He then proceeded to say in the *Mosley Case* (p 691):

"We are compelled to reach the same result in the case at bar and for the same reasons. There was evidence from plaintiff that he suffered pain immediately after the impact at the scene of the injury and a policeman testified that, indeed, plaintiff then complained of pain."

Justice SOURIS went on to conclude that having found there was pain and suffering and having awarded damages to compensate plaintiff for the medical cost of relieving such pain, the jury could fail to award plaintiff damages for the pain already endured only by arbitrary, capricious disregard of the trial judge's explicit instructions to the jury. The Court, therefore, set aside the verdict.

In the instant case, the jury did not even allow the actual amount of the medical expenses which were shown to have been paid for services to alleviate the pain, suffering, and disability growing out of the accident involved in this cause. The use of the flat sum of $500 indicates the jury disregarded the instructions of the court and the testimony as to damages. We conclude the verdict is against the great weight of the evidence.

In view of the above, the verdict should be set aside. The judgment should be reversed and a new trial as to damages only should be granted. Plaintiff should have costs.

BLACK and OTIS M. SMITH, JJ., concurred with KAVANAGH, J.