## DAUER v. ZABEL

1. DEATH—WRONGFUL—AUTOMOBILES—INTERSECTIONAL COLLISION—
   NEGLIGENCE.

   Wrongful death judgment against defendant was proper where
   evidence showed that he was driving an automobile, without
   lights, at 60, or more, miles per hour on a wet, slippery,
   narrow, blacktop road at a time when darkness, fog, and a
   heavy rain had rendered visibility extremely poor and, as he
   approached an intersection, he also failed to keep a proper
   lookout, failed to sound his horn in warning after he saw
   the vehicle in which plaintiff's decedent was riding, and failed
   to take necessary and proper action to avoid a collision by
   braking or taking other evasive action (CLS 1961, § 257.627
   [a]; MCLA § 257.706).

2. APPEAL AND ERROR—NONJURY CASE—FINDINGS OF FACT.

   The Court of Appeals will not set aside trial judge's fact find-
   ings in a nonjury case unless his findings are clearly erroneous
   or unless the record clearly preponderates against them as to
   determination of liability and causation (GCR 1963, 517.1).

3. EVIDENCE—TESTIMONY—WEIGHT.

   The weight to be accorded testimony received into evidence is
   for the trier of fact.

---

### REFERENCES FOR POINTS IN HEADNOTES

[1, 11]  22 Am Jur 2d, Death § 2 et seq.
[2]  5 Am Jur 2d, Appeal and Error § 839.
[3]  30 Am Jur 2d, Evidence § 1080 et seq.
[4]  7 Am Jur 2d, Automobiles and Other Motor Vehicles § 355.
[5]  38 Am Jur, Negligence § 350.
[6]  29 Am Jur 2d, Evidence §§ 188, 189.
[7]  41 Am Jur, Pleading § 330 et seq.
[8]  22 Am Jur 2d, Death §§ 176, 177.
[9, 10]  22 Am Jur 2d, Death §§ 218, 250.

4. HIGHWAYS — ARTERIAL — DRIVER'S DUTY — LOOKOUT — ADVERSE
   CONDITIONS.
   A driver on an arterial highway must maintain a vigilant look-
   out for vehicles approaching the traffic artery from either
   side and must make reasonable allowances for traffic road and
   adverse weather conditions.

5. NEGLIGENCE—STATUTES—NONCOMPLIANCE—FACT QUESTION.
   Failure to comply with pertinent statutory provisions presents an
   issue of fact in a negligence action and determination of
   that issue is for the trier of fact.

6. EVIDENCE—PARTY—FAILURE TO TESTIFY.
   The unexplained failure of a party to appear and testify in a
   civil action is to be considered as a circumstance indicating
   that the testimony, had it been given, would have been detri-
   mental to his case.

7. MOTIONS—DIRECTED VERDICT—NONJURY NEGLIGENCE ACTION.
   Motion for directed verdict in a nonjury negligence action will
   be considered as a motion to dismiss (GCR 1963, 504.2).

8. DAMAGES—DEATH—WRONGFUL.
   Damage award of $15,721.40 for the wrongful death of a five-
   year-old child was not excessive.

9. DEATH—DAMAGES—MINOR CHILD—PRESUMPTION OF VALUE.
   A minor child's life is presumed to be of value to his parent
   because the parent is entitled to the minor's services and is
   responsible for his support.

10. DEATH—DAMAGES—MINOR—VALUE—PROOF.
    A parent is not restricted to the recovery of nominal damages
    for the wrongful death of a minor child because the value
    of that child's services, or the expenses incurred or moneys
    paid for his support, have not been proved.

11. DEATH—WRONGFUL DEATH—PROBATE CODE.
    An action brought under the wrongful death statute is not
    governed by the probate code (CL 1948, §§ 691.581, 691.582,
    702.115).

Appeal from Saginaw, James E. O'Neill, J. Sub-
mitted Division 3 May 7, 1969, at Grand Rapids.
(Docket No. 1,931.) Decided October 1, 1969.

Complaint by Eva F. Dauer, administratrix of the estate of David Anthony Dauer, deceased, against Carl J. Zabel for wrongful death. Judgment for plaintiff. Defendant appealed. Reversed and remanded for new trial. 9 Mich App 176. Plaintiff appealed to Supreme Court. Court of Appeals order vacated and remanded to trial court for findings of fact, and further action by Court of Appeals. 381 Mich 555. Supplemental opinion and findings of fact certified to the Court of Appeals. Judgment for plaintiff affirmed.

*Cicinelli, Mossner, Majoros, Harrigan & Alexander,* for plaintiff.

*Smith, Brooker, Harvey & Cook (A. T. Lippert, Jr.,* of counsel), for defendant.

Before: Holbrook, P. J., and R. B. Burns and Wise,* JJ.

Holbrook, P. J. This is an action brought by plaintiff, administratrix of the estate of David Anthony Dauer, against defendant, Carl J. Zabel, for recovery under the Michigan wrongful death act, CL 1948, §§ 691.581, 691.582 (Stat Ann 1959 Cum Supp §§ 27.711, 27.712).[1] This cause was heard by the court, without a jury, and a final judgment in favor of plaintiff was entered for the sum of $15,721.40, plus interest from the date of death of the deceased.

A history of the progress of this case on appeal is set forth in *Dauer* v. *Zabel* (1967), 9 Mich App 176, and *Dauer* v. *Zabel* (1969), 381 Mich 555. The trial judge has filed a supplemental opinion and findings

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] See, currently, MCLA § 600.2922 (Stat Ann 1969 Cum Supp § 27A.2922).

of fact which have been certified as required by the remand.

Involved in this cause is a two-car accident which occurred at the intersection of East Kent and Sasse roads in Midland county, on May 2, 1962, about 5:30 p.m., resulting in fatal injury to plaintiff's decedent, David Anthony Dauer, age 5 years, a backseat passenger in a 1958 English Ford automobile driven by his older brother, Thomas Dauer, age 18 years. The English Ford was travelling west on East Kent road, a two-lane, gravel road, running east and west. Defendant Carl J. Zabel, driving a 1957 Buick automobile, was proceeding south on Sasse road, a two-lane, blacktop road, running north and south over East Kent road. A stop sign was located at the intersection requiring traffic on Kent road to stop before negotiating Sasse road. That decedent's driver stopped at the intersection in obedience to the stop sign was undisputed.

While there was some conflict in the testimony of the various witnesses concerning the prevailing weather conditions at the time of the accident, the main thrust of the testimony on this point was to the effect that visibility was poor.

At the trial of this cause, defendant did not take the stand and did not present any proofs, except through cross-examination of plaintiff's witnesses. However, a part of defendant's deposition was introduced into evidence by plaintiff.

Defendant on appeal presents two questions for consideration which are restated and dealt with in order.

1. *Was there sufficient evidence presented upon the trial of this cause to warrant a verdict for plaintiff?*

Plaintiff's complaint alleged that the defendant was guilty of negligence in striking the automobile in which plaintiff's decedent was riding, and that such

negligence was a proximate cause of the death of plaintiff's decedent. Such acts or failure to act of defendant are dealt with in the trial judge's findings of facts, *viz.*:

"The court finds that the defendant was negligent in the following respects and that such negligence was a proximate cause of the accident in question:

"1. Defendant was driving at a speed of 60 miles per hour or more on a rather narrow, blacktop road, which was wet and slippery.

"2. He was driving without lights at a time when it was dark, foggy and raining heavily, and visibility was extremely poor. Had defendant taken the precaution to light his lights he may very well have been seen by plaintiff's driver as he approached, and the accident may well have been avoided.

"3. The speed at which defendant was driving was excessive under all of the circumstances and conditions existing, and defendant was thus in violation of the basic speed law, CLS 1961, § 257.627(a) (Stat Ann 1960 Rev § 9.2327[a]).

"4. He failed to keep a careful and proper lookout as he approached the intersection.

"5. He failed to sound his horn in warning, after he saw plaintiff's vehicle pull out from the stop sign. This, in the court's opinion, was in violation of MCLA § 257.706 (Stat Ann 1968 Rev § 9.2406). Had defendant sounded his horn in timely fashion, plaintiff's driver may well have been able to take evasive action himself to avoid the accident.

"6. He failed to take necessary and proper action to avoid the accident, by timely application of his brakes or taking other evasive action."

The proofs offered by plaintiff upon the trial of this cause consisted of the examination of several witnesses who testified as to their observations on May 2, 1962, at or near the time of the accident in question at the accident scene. Witness Russell

Hartley, at the time a deputy sheriff with the Midland county sheriff's office, who investigated the accident at East Kent and Sasse roads shortly after its occurrence, testified in part as follows:

"*Q.* When you arrived at the scene of the accident, Mr. Hartley, what was the weather like?

"*A.* It was raining,—wet.

"*Q.* Were both roads wet?

"*A.* Yes, sir.

"*Q.* The Sasse road was a blacktop road, was it?

"*A.* Yes, sir.

"*Q.* And Kent road was a gravel road?

"*A.* Yes, sir.

"*Q.* How would you describe the atmosphere as far as lighting conditions and things of that nature?

"*A.* It was cloudy, of course, and raining.

"*Q.* And—

"*The Court:* It was raining when you arrived, witness?

"*A.* Yes, sir.

"*The Court:* I see. And the road was wet?

"*A.* Yes, sir.

\* \* \*

"*Q.* Did you talk to Mr. Zabel out there at the scene of the accident?

"*A.* Yes.

"*Q.* And you questioned him about how the accident had occurred, is that right?

"*A.* That's correct.

"*Q.* Did you ask him about the speed of his automobile?

"*A.* Yes, sir, I did.

"*Q.* At the time of the collision, his speed then?

"*A.* Yes, sir.

"*Q.* And what did you ask him and what did he tell you?

"*A.* I asked him how fast he was traveling and at that time he said 60 miles an hour.

"*Q.* He told you, did he not, that the other car had stopped at the intersection?

"*A.* That is correct.

\*    \*    \*

"*Q.* Now, officer, you have indicated it was raining at the time you got there at the scene of the accident. How would you describe the rain, heavy or light?

"*Mr. Lippert* [*defendant's attorney*] : Let the witness describe it, please.

"*A.* Well, it was raining quite hard. I had my raincoat on at the time, (*pause*) or all during the time I was there.

"*Q.* Were there any other atmospheric conditions present that you noticed?

"*A.* There was a slight ground fog.

\*    \*    \*

"*Q.* Did you notice in making your report of this accident any obstructions of any kind for either driver?

"*A.* Well, the windshields were wet, of course, due to the rain.

"*Q.* Both of them?

"*A.* Both of them, yes.

\*    \*    \*

"*Q.* Did you notice anything with respect to the lights on the car, the Buick automobile, when you got there?

"*A.* (*pause.*) No, sir, I didn't.

"*Q.* You didn't notice what?

"*A.* Lights on the Buick automobile.

\*    \*    \*

"*Q.* Mr. Hartley, you testified in part as to what the conversation was you had with Mr. Zabel following the accident, as shown on your accident investigation report?

"*A.* Well, his statement, as one of the drivers, was taken at the scene.

"*Q.* Yes. What was that full statement? Would you give it to us as it is indicated on your accident report? Can you make it out?

"*A.* It's pretty dim, sir, but I think I can. Mr. Zabel stated that he was traveling south on Sasse road and observed the number 2 car—

"*Q.* Would that be Mr. Dauer's automobile?

"*A.* Yes, sir, that is the car. He said he observed it stop at the intersection."

Witness Thomas Duane Dauer, driver of the automobile in which plaintiff's decedent was a passenger, testified in part:

"*Q.* Tell us, as you approached the intersection of Sasse and East Kent roads on that day, what was the weather like?

"*A.* It was raining and a ground fog.

"*Q.* When you say it was raining, Tom, could you describe that a little better for us?

"*A.* Yes. It was a heavy rain.

"*Q.* When you were at the store in Laporte, was it raining or just starting to rain?

"*A.* It was sprinkling at that time, but it had gotten heavier.

"*Q.* It had gotten heavier?

"*A.* Yes, sir.

"*Q.* Where was your brother located in the car as you approached this intersection?

"*A.* In the back seat.

"*Q.* And you were seated in the front seat, Tom, driving?

"*A.* Yes, sir.

"*Q.* Were the windshield wipers going?

"*A.* Yes, sir.

"*Q.* Was there a defroster on that car?

"*Mr. Lippert:* These are all leading questions.

"*The Court:* Well,—

\*   \*   \*

"*The Court:* I think you may ask the witness what equipment his car had, Mr. Mossner.

"*Mr. Mossner* [*plaintiff's attorney*] (*continuing*):

"*Q.* What equipment did your car have, Tom?

"*A.* A heater and defroster.

\*   \*   \*

"*Q.* Tell us what happened when you came to the intersection of Kent and Sasse roads.

"*A.* Well, I came up to the intersection and stopped at the stop sign. My brother and I played a game. Whenever I would take him anywhere, I would let him show me the way home so that he could get to know the area, so that whenever he went by himself somewhere he could find his way home later in life. I stopped and I reached over and wiped off the side window so I could see. While I was doing that, I asked him which way should I go. \*   \*   \*

"*Q.* Let me rephrase it. Did you do anything else, Tom, other than wipe off the window and have a conversation with your brother while you were stopped there?

"*A.* Yes, I looked both ways.

"*Q.* Could you tell us approximately how long you were stopped there?

"*A.* (*pause.*) I don't know.

"*Q.* Now after you have indicated you started to proceed into this intersection, Tom, what is the next thing you remember?

"*A.* Would you state that again, please?

"*Q.* What is the next thing you remember after you started to proceed into this intersection?

"*A.* Just laying in the car and people asking me questions."

Clayton Birtles, whose home was located near the accident scene on May 2, 1962, testified in part:

"*Q.* And I'll ask you whether or not before the time the accident happened if you had noticed either one of the 2 cars involved in this collision?

"*A.* Just the one.

"*Q.* Which one?

"*A.* The little English Ford.

"*Q.* And when had you seen that car?

"*A.* Oh, it was a little after 5, about a quarter or 20 minutes after 5.

"*Q.* And where did you see it?

"*A.* Through the window when I was eating supper.

"*Q.* Through the window of your home?

"*A.* Yes, sir.

"*Q.* What room were you in?

"*A.* In the south room,—in the kitchen on the south side of the house.

"*Q.* Did you actually see the collision between the 2 vehicles?

"*A.* No, no.

"*Q.* At the time you saw the English Ford, you have told us about, can you tell us what the weather conditions were like outdoors?

"*A.* It was raining, misty, getting to be a foggy night.

"*Q.* How about the light conditions outside?

"*A.* It was hazy, getting dark out.

\* \* \*

"*The Court:* And you were able to see this car from your kitchen window?

"*A.* Yes, sir.

"*The Court:* Was that as it passed the house?

"*A.* Yes. It was going slow when it went by the house."

Plaintiff's counsel offered as evidence in the trial, pursuant to GCR 1963, 302.4(2), portions of defendant's deposition. Counsel read two questions from the deposition and defendant's answers:

"Question, 'Did you at any time decrease the speed of your car from this 55 or 60 miles an hour that you were driving prior to the impact?' Answer, 'I don't know.' \* \* \* Question, 'You were aware, weren't you, Mr. Zabel, that on a wet blacktop road it would take more distance to stop than on a dry blacktop road?' Answer, 'Yes.' "

In 9 Callaghan's Michigan Pleading & Practice, § 65.96, it is stated:

"The reviewing court will not ordinarily review the evidence in an automobile accident case, except to ascertain whether evidence was adduced which was legally sufficient to show contributory negligence or negligence as a matter of law, or to take the case or a particular question to the jury, or to determine whether there was evidence legally sufficient to support a fact finding, the judge's opinion or the jury's verdict. Unless there is something to indicate that the judge or jury was influenced by some consideration other than the evidence, the reviewing court will not disturb a determination of fact where the evidence is about evenly divided, or if there is any competent, credible and persuasive evidence in the record, sufficient to support the determination, or, of course, if the evidence clearly supports the judgment. On appeal, the reviewing court does not try the case *de novo,* and it will not substitute its judgment for that of the jury as to the credibility or weight to be accorded the testimony, or disturb a determination of fact merely because it would have reached a different conclusion."

GCR 1963, 517.1, provides in part as follows:

"Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it."

This Court will not set aside the findings of fact of a trial judge in a nonjury case unless they are clearly erroneous or unless the record clearly preponderates against the findings of the trial court as to determination of liability and causation.[2]

2 *Hoffmaster* v. *McNett* (1966), 2 Mich App 709, 712; *Bill* v. *Brown* (1966), 2 Mich App 455, 457; *Teachout* v. *Maiers* (1965), 2 Mich App 69, 73; *Airport Motel Corporation* v. *Burke, Burke, Ryan*

We cannot say that defendant has shown that the trial court's findings were clearly erroneous. It is true that defendant cites several Michigan cases for the proposition that defendant's negligence, if any, must be determined by examining the duty of care owed to a passenger in the position of plaintiff's decedent. To this end defendant cites *Arnold* v. *Krug* (1937), 279 Mich 702; *McGuire* v. *Rabaut* (1958), 354 Mich 230; *Churukian* v. *LaGest* (1959), 357 Mich 173; *Noyce* v. *Ross* (1960), 360 Mich 668. Each of the cases cited is distinguishable on its facts from the case under consideration, and not conclusive of an absence of negligence by defendant in the instant case. In each case, the weight to be accorded testimony received into evidence is for the trier of fact, each case to be determined upon its own merits. *Wright* v. *Barron* (1947), 318 Mich 409, 416.

In *Tucker* v. *Gillette* (1967), 6 Mich App 210, consideration was given to the rights and duties of a driver on the favored street or highway when faced with the possibility of a confrontation with another automobile at an intersection. Defendant, in her automobile, on an apparently clear day, failed entirely to observe a posted stop sign before negotiating an intersection, thereby striking an automobile driven by plaintiff, the favored driver, as it entered the intersection. This Court affirmed the judgment for defendant stating at pp 215, 216:

"Speed was not the only fact at issue bearing on plaintiff's contributory negligence. The jury could consider the question of plaintiff's diligence or neg-

*& Roberts* (1966), 4 Mich App 385, 387; *Tann* v. *Allied Van Lines, Inc.* (1966), 5 Mich App 309, 313; *Burke* v. *Gaukler Storage Company* (1968), 13 Mich App 536, 537; *Byars* v. *Sullivan* (1968), 14 Mich App 217, 220. See, also, *Pogletke* v. *Schwanz* (1957), 349 Mich 129, 134; *Mellios* v. *Charney* (1957), 350 Mich 199, 203; *G. C. Kay Company* v. *Standard Steel Treating Company* (1958), 352 Mich 234, 238, 239; *Eglash* v. *Detroit Institute of Technology* (1965), 375 Mich 592, 595.

ligence in keeping a proper lookout for traffic approaching from either side. Plaintiff noticed defendant approaching the intersection and then ignored defendant's approach until she hit him.
* * *

"Plaintiff cites certain cases which suggest that arterial right-of-way must be absolute in favor of the policy of rapid transit, that one having the right-of-way may assume, in the absence of visual evidence to the contrary, that the operator of a vehicle approaching an intersection on a stop street will observe the traffic sign and stop. But manifestly this cannot be treated as a matter of law. Uniformly, the cases have allowed the jury to decide this as a matter of fact, e. g., *Breker* v. *Rosema* (1942), 301 Mich 685 (141 ALR 867). * * * Along with an increased lawful speed necessarily goes a heavier burden of diligence in maintaining a vigilant lookout for automobiles approaching the traffic artery from either side.

"We are in accord with the Supreme Court's majority reasoning in *Krause* v. *Ryan* (1955), 344 Mich 428, followed in *Depriest* v. *Kooiman* (1966), 2 Mich App 431. The jury is the only institution known to our law capable of resolving this question."

In *Churukian* v. *LaGest, supra,* cited by defendant, in a concurring opinion by Mr. Justice TALBOT SMITH, it is stated at p 182:

"[T]he defendant's car was being driven in a northerly direction upon Telegraph road, an arterial highway, at a speed under the maximum rate allowed. The driver, as we know, was under a duty to exercise due care. He must make reasonable allowance for traffic conditions, for fog, snow, or other adverse weather conditions, and for curves and road conditions." [*Davis* v. *Pere Marquette R. Co.* (1927), 241 Mich 166, 168; *Harding* v. *Blankenship* (1936), 274 Mich 118, 124; *Ruby* v. *Buxton* (1943), 305 Mich 64, 67; *Russell* v. *Szczawinski* (1934), 268 Mich 112, 115.

See also, 1 Blashfield's Cyclopedia of Automobile Law & Practice, part 2, § 749, pp 682, 683.]

In *Schaibly* v. *Vinton* (1953), 338 Mich 191, the Supreme Court affirmed a lower court judgment for defendant against a driver traveling on a favored highway. It was stated at pp 194, 195:

"Plaintiff claims that defendant did not stop before entering Greenfield road. Defendant claims that the plaintiff did not enter the intersection with caution; that he was exceeding the speed limit; that he was relying upon the horn he was blowing rather than caution; and that he saw and was aware of the closely approaching traffic. * * *

"Had plaintiff gone slower and thus had his car under better control the accident would not have occurred."

Plaintiff contended, and the circuit court found, on the basis of the evidence presented in the trial of this cause, that defendant was driving without the lamps of his automobile lighted and that under the atmospheric conditions existing at the time of the accident, it was incumbent upon defendant to take this precaution in order to allow himself to be seen by plaintiff's driver. The Supreme Court, in *Schian* v. *Bierlein* (1963), 369 Mich 219, 221, held that the question of failure to comply with the pertinent statutory provisions (CLS 1956, §§ 257.684, 257.686 [Stat Ann 1960 Rev §§ 9.2384, 9.2386]) presents an issue of fact. As such, determination of the issue is for the trier of fact based upon the evidence presented in the cause.

We note the statement by the circuit court judge in his supplemental opinion at p 8:

"It may be that the defendant Zabel, had he testified, could have explained his conduct to the court in such a fashion so as to absolve himself from re-

sponsibility for the accident, but he elected not to testify, and consequently the court may conclude that his testimony may well have been unfavorable to himself on a number of issues. See *Blackwood* v. *Brown* (1874), 29 Mich 482, 484; *Cooley* v. *Foltz* (1891), 85 Mich 47, 49; *Vergin* v. *City of Saginaw* (1901), 125 Mich 499, 503; *Dowagiac Manufacturing Co.* v. *Schneider* (1914), 181 Mich 538, 541; *Griggs* v. *Saginaw & F. R. Co.* (1917), 196 Mich 258, 266; *Douglas* v. *Insurance Company of North America* (1921), 215 Mich 529, 537."

In 3 Callaghan's Michigan Pleading & Practice, § 36.89, pp 483, 484, we find the following:

"In general, presumptions may be indulged against an interested party who fails to take the stand and testify in his own behalf, where he is mentally and physically able to do so, and where facts involved in the controversy are particularly or peculiarly within his knowledge, and especially if his testimony would have supplied positive evidence of what it was otherwise necessary to establish by inference from other evidence. The unexplained failure of a party to appear and testify is to be considered as a circumstance indicating that the testimony, had it been given, would have been detrimental to his case. It may be presumed that the facts within the party's knowledge, if they had been elicited, would have been harmful to him, the evidence in the case may be construed against him, and doubts may be resolved in favor of his opponent."

There was, upon the trial of this cause, sufficient evidence presented to support the court's verdict for plaintiff.[3]

Defendant moved for directed verdict of no cause of action and renewed an earlier motion for invol-

---

[3] *Vannett* v. *Michigan Public Service Co.* (1939), 289 Mich 212, 218; *Rose* v. *Paint Manufacturers, Inc.* (1945), 311 Mich 428, 429; *Marion* v. *Savin* (1946), 315 Mich 448, 453; *Siller* v. *Laitila* (1963), 370 Mich 373, 377.

untary dismissal pursuant to GCR 1963, 504.2, after both sides had rested their cases. In a nonjury negligence action a motion for directed verdict will be considered as a motion to dismiss. *McCarron* v. *Upper Peninsula Hauling Association* (1968), 13 Mich App 168, 169. Having determined that the circuit court's verdict was justified in light of the evidence, defendant's renewed motion for involuntary dismissal was properly denied by implication. 42 CJ, Motion and Orders, § 148, p 511.

2. *Was the circuit court's damage award of $15,-721.40 to the decedent's estate excessive?*

The statute concerning damages for wrongful death is found in CL 1948, § 691.582 (Stat Ann 1959 Cum Supp § 27.712). The determination of pecuniary loss in death cases is now ruled by the cases of *Wycko* v. *Gnodtke* (1960), 361 Mich 331; *Currie* v. *Fiting* (1965), 375 Mich 440; *Heider* v. *Michigan Sugar Company* (1965), 375 Mich 490; *Reisig* v. *Klusendorf* (1965), 375 Mich 519.

In awarding damages, the circuit court stated in part:

"In the instant case there was testimony by the mother of the deceased five-year-old child that David Anthony Dauer had been born in a hospital, with a doctor in attendance; that he had very few illnesses during his short lifetime, and that he was in good health at the time of his death; the testimony further showed that he was about to enter school and had taken an entrance examination which presumably he had passed; he was a loving and affectionate son, and according to the mother, much more so than her other four children. The mother indicated further that he had a unique way of expressing himself, thus indicating to the court that he was a bright and intelligent child. * * *

"This court, using its own experience in life, presumes that this young boy, like most young boys,

would have in his later years been of much service
to both his father and mother in many ways, and
that such services would have continued for a num-
ber of years, even perhaps past his majority. No
exact formula can, of course, be used in determining
the value of these services, but this court feels that
such future services, reduced to their present worth,
should be conservatively valued at $10,000 and
awards this amount for this loss.

"There is no dispute as to the funeral expenses
involved here. These amount to $1,071.40, and this
amount is also made a part of the award to plain-
tiff. * * *

"This court takes judicial notice of the fact that
the United States government, for income tax pur-
poses, allows $600 per year for each dependent. The
court as a parent also recognizes, along with many
others, that this amount of money does not represent
the actual cost to parents of raising a child but even
using a similarly small figure as a guideline, the
plaintiff here would be entitled to at least the sum of
$4,000 for the loss of investment for the five years
and seven months during which the child lived.
When one considers the initial cost of birth, along
with this amount, the court does not feel that an
award of $4,650 for this item of damages is at all
excessive, and this amount is awarded to the ad-
ministratrix for the loss of investment in the child."

Defendant asserts that, in the trial of this cause,
no competent proofs were introduced in evidence to
substantiate the damage awards of the circuit court.
This same contention was put forth by defense coun-
sel in *Black* v. *Michigan Central R. Co.* (1906), 146
Mich 568, and the ruling therein is still good law, pp
572–574:

"2. We again quote from brief of counsel:
" 'The declaration in the case at bar alleged that
the plaintiff had suffered pecuniary injury, but the

record is absolutely barren of evidence to support the allegation. * * * Mr. Black, the boy's father, testified that his son had been killed, and gave the ages of himself, his wife, and son. The trial court held that this was ample to justify the jury in assessing substantial damages, despite the protest of defendant's counsel, who argued that its effect was to leave the jury in the field of speculation, and to make each of the jurymen witnesses for plaintiff as to whether pecuniary injury had been suffered and the amount thereof. * * *

" 'The law presumes the life of a minor child to be of value to his parent, because he is entitled to his services and is responsible for his support during minority. He is necessarily injured by a wrongful act resulting in the death of such minor child, which thereby deprives him of the value of those services and casts upon him the burden of legal liability for that support when deprived of the value of such services, enhanced by the additional expense of providing medicine, medical attention, and nursing during illness, and for funeral charges when he dies. To compensate him for this loss and this burden, the law allows the parent of such minor substantial damages, and they may be measured by the experience and judgment of the jury, enlightened only by a knowledge of the age, sex, and condition in life of the deceased, and the parent is not restricted to the recovery of merely nominal damages, because the value of the services of the child, or the amount of expenses incurred or paid for his support, and other necessaries during illness, or funeral expenses, be not proven.' "

Defendant further contends that the probate code, PA 1939, No 288, CL 1948, § 702.115 (Stat Ann 1962 Rev § 27.3178[185]) is controlling of the wrongful death act, *supra,* and that it must be read in connection with the wrongful death act in arriving at a determination of damages.

In *Currie v. Fiting, supra*, Mr. Justice ADAMS stated at p 453:

"But, it is argued, even if the wrongful death statute permits recovery, the probate code, PA 1939, No 288, ch 2, § 115 (CL 1948, § 702.115 [Stat Ann 1962 Rev § 27.3178(185)]), does not, and the probate code, it is contended, is controlling. We do not regard this action, brought under the wrongful death statute, as being governed by the probate code."

We follow the last words of the Supreme Court on this point and dismiss defendant's contention as without merit.

We conclude that the damages awarded were not excessive.

Affirmed, costs to plaintiff.

All concurred.